OPINION OF THE COURT
David Goldstein, J.
The issue, one of apparent first impression, is the propriety of a street showup, which occurred geographically close to the crime scene but several months after its commission, where it was civilian witnesses who had initiated the police action which resulted in the showup identification procedure.
Defendant is charged, inter alla, with attempted murder in the second degree. On August 23, 1991, while the complainant, Vivian Falk, was swimming in the ocean in Far Rockaway, defendant approached her, pulled at her bathing suit and tried to push her head under the water in an attempt to choke and drown her.
A combined Wade/Huntley hearing was held on March 13 and 18, 1992. The People called one witness, Police Officer John Heidrich, assigned to the 101st Precinct. The defendant testified on his own behalf. The court finds Officer Heidrich’s testimony to be credible and not marred by any serious inconsistencies.
On October 11, 1991, Heidrich, a six-year police veteran, received a radio run that a perpetrator from a past assault was observed on Seagirt Avenue and Beach 4th Street, in the Far Rockaway section of Queens. As he arrived at the location, he was informed by a fellow officer that a Leona Freel had witnessed an assault on Vivian Falk some IVz months earlier, on August 23, 1991. Freel told the police officers that she had seen the same man heading west on Seagirt and described him as a male Hispanic, possibly Indian, approximately 50 years of age, with long white hair.
Heidrich then proceeded west on Seagirt Avenue and onto *206 the boardwalk, which began at Beach 9th Street. At about Beach 13th Street, he observed defendant, who matched the description given by Freel, walking on the boardwalk. He stopped defendant and radioed for backup in order to transport the witness to the location. Approximately five minutes later, Freel arrived and proceeded to identify defendant as the man she had observed almost IV2 months earlier, in the attack upon Ms. Falk. She also advised Heidrich that she and Falk were just at Freel’s home and both observed defendant walking on Beach 4th Street. At the time of Freel’s identification, defendant was standing, without handcuffs, next to Heidrich’s unmarked automobile. Thereafter, a call was made for a sector car to bring Falk to the scene. Within five minutes, Falk arrived and likewise identified defendant, who, again, was not in handcuffs. All of this occurred in the morning, on October 11, 1991, at about 8:00 a.m.
Defendant was then placed under arrest and advised of his Miranda rights. He did not respond either in the affirmative or negative when asked whether he understood his rights or wished to answer questions without an attorney present. At the precinct, late in the morning or early afternoon, Detective Smith, assigned to the Queens Sex Crimes Unit, again advised defendant of his Miranda warnings, whereupon defendant indicated that he understood his rights and would answer questions. He then wrote and signed a statement which reads "I do say, I tried to find him (?) (Personnal Answer) to tack to (him) (?) to say Don’t be cruel with the people Please.”
Showup identifications, while generally suspect and disfavored, are permitted when conducted shortly after the crime, at or near the crime scene (see, People v Duuvon, 77 NY2d 541; People v Hicks, 68 NY2d 234; People v Love, 57 NY2d 1023; People v Brnja, 50 NY2d 366). The policy considerations underlying prompt identification viewings were set forth in People v Blake (35 NY2d 331, 337), albeit that case, as far as appears, did not involve an on-the-scene showup: "Failure of a witness’ memory is directly related to the passage of time between first visual impression and later efforts to recall (see Russell v. United States, 408 F. 2d 1280, 1284, cert. den. 395 U. S. 928, supra). Delay may prove fatal to a witness’ ability to recall. Speedy viewings, on the scene if possible, benefit both law enforcement and the defendant (People v. Logan, 25 N Y 2d 184, 194, supra). If the accused is identified as the culprit, the witness’ recollection will be as fresh and reliable as his capacity and the situation permits. If the accused is not *207 identified, he may then be released with a minimum of delay.” (People v Blake, supra, at 337.)
In People v Brnja (supra), the police responded to a report of a robbery in a liquor store and received a description of the perpetrator and of a van which had been seen circling the area. A search of the area resulted in the discovery of the van, with defendant inside. After being advised that he was a suspect in the robbery, defendant was taken, in handcuffs, three quarters of a mile, back to the scene of the robbery, where he was identified in a one-on-one showup. In sustaining the identification procedure used in that case, the Court of Appeals held that, actually, defendant had been placed under arrest when he was stopped and detained and, since there was probable cause for the arrest, "there was no constitutional infirmity in * * * the one-on-one showup at the scene in view of its proximity in time and location to the point of arrest” (supra, 50 NY2d, at 372).
Similarly, in People v Love (supra), defendant was apprehended about one block from complainant’s apartment, which he had allegedly burglarized. Complainant returned home and discovered a man in her bedroom. A transit officer, who responded to her cries for help, observed defendant on the fire escape, chased him down the street and caught him about one block away, thereafter, returning him to the lobby of the building, where he was identified. The Court of Appeals sustained the showup, particularly "in view of the proximity of the apprehension of defendant in time and space (five minutes and one block * * *) to the scene of the crime.” (Supra, 57 NY2d, at 1024-1025.)
In People v Hicks (68 NY2d 234), notwithstanding the absence of probable cause for arrest, the Court of Appeals sustained a stop and detention of a suspect, who was transported back to the crime scene for possible identification. It held that the detention and transporting of defendant to the scene after robbery was reasonable, since the witnesses were only one quarter of a mile away — one minute away by car— and that those witnesses would either identify defendant, in which case he would be arrested, or would not, in which case he would be released. The Court, in an opinion by Judge Kaye, observed (68 NY2d, at 242): "A speedy on-the-scene viewing thus was of value both to law enforcement authorities and to defendant, and was appropriate here”.
More recently, in People v Duuvon (77 NY2d 541, supra), the *208 Court sustained a showup identification by an employee, at the robbery scene, a few minutes after the crime, which took place after defendant had been identified by the store manager. After citing the need to carefully scrutinize such show-ups "for unacceptable suggestiveness and unreliability” (supra, at 543), the Court held the showup to be within permissible bounds: "The showup identification was made upon defendant’s return to the robbery scene approximately two minutes after his arrest, three to four minutes after the commission of the crime, and literally around the corner from the arrest scene. This was one unbroken chain of events — crime, escape, pursuit, apprehension and identifications — all within minutes and within a New York City block and a half.” (77 NY2d, at 544-545, supra.)
In upholding the on-the-scene identifications, the Court in Duuvon (supra) found that the fact that the manager had already identified defendant just before the employee showup took place was not dispositive, concluding that the different types of on-the-scene identifications showed that they did not lend themselves to any per se or presumptive rules. Thus, the Court of Appeals recognized the significance of both temporal and spatial considerations in evaluating these street encounters on a case-by-case basis, not by any generally applied rules which establish or fix levels of exigency.
The factual situation in our case poses a quite different and most unique issue, unlike any of the cited cases, in that here, the showup took place more than IV2 months after the commission of the crime, albeit, geographically, in reasonably close proximity to the scene of the crime. Nevertheless, in my view, the critical considerations in terms of the propriety and reasonableness of a civilian showup are its relationship to the apprehension of the defendant and the last viewing or sighting by the victim-witness before the police are summoned, not necessarily the commission or occurrence of the crime. After all, it is this identification which forms the requisite basis and probable cause to effectuate the defendant’s arrest.
Thus, although most of the reported decisions involve show-ups conducted soon after the commission of the crime, the very same analysis applicable in such instances should apply to the situation and facts of this case. Both Freel and Falk observed a person whom they subsequently identified as defendant, without any police action or involvement, as defendant walked by the farmer’s house. Thus, at that moment, the observation or sighting, for practical purposes, was essentially *209 the same as a victim’s having viewed a perpetrator during the commission of the crime. Plainly, if the witness was mistaken in terms of identification, it was not as a result of any police action or misconduct.
Although the passage of time is certainly a factor which the trier of the facts should weigh when evaluating identification testimony, at this stage the court is principally concerned with whether the identification process was unduly suggestive and, if so, whether it was conducive to a substantial likelihood of irreparable misidentification (see, Stovall v Denno, 388 US 293; Simmons v United States, 390 US 377).
Under the circumstances, the police conduct and any possible suggestiveness did not take place until after Freel and Falk had seen defendant and notified the police. Accordingly, the critical time period is not the time between the crime (August 23, 1991) and the showup (October 11, 1991) but rather, the relatively short interval between Freel and Falk’s viewing of defendant on October 11, 1991, when defendant walked past Freel’s house, and the showup, which occurred minutes later. Under this analysis, the showup meets the criteria as set forth in the above cases, namely, it was prompt, at or close to the scene of the crime and, since it was not unduly suggestive, it should be sustained.
Moreover, the fact that probable cause existed to arrest defendant after Freel had identified him does not require that Falk’s later identification be suppressed. As was recently observed by the Court of Appeals in People v Duuvon (supra, 77 NY2d, at 545), which upheld a second showup procedure by another witness, while defendant was seated, in handcuffs, in the rear of the police car, notwithstanding that defendant had already been identified by a different victim: "The judicial toleration of promptly conducted at-the-scene showups rests on our objective that the police have reasonable assurances that they have arrested or detained the right person. That societal interest should not be deemed automatically cast aside by the existence of a prior identification in this fast-moving, uninterrupted array of activity (see, People v Brnja, 50 NY2d, supra, at 372). Freezing the frame at the point of apprehension and initial identification and ignoring the uncertain, emergent realities and varieties of these street situations —as a matter of law from detached, distanced and deliberated perspective — is neither wise nor sensible.”
The showups in this case, conducted while defendant was *210 standing, without handcuffs or other restraint, next to an unmarked police vehicle, were certainly less suggestive or objectionable than those sustained in Duuvon (supra) where, as noted, defendant was clearly in custody, handcuffed, in the rear of the police vehicle. This, the Duuvon Court held, pressed "judicial tolerance to its limits” (supra, at 545).
With respect to the Huntley aspect of the hearing, the defendant’s silence, as regards his Miranda rights first given by Heidrich, indicates that he neither expressly nor impliedly waived his rights (see, People v Nocella, 129 AD2d 653; People v Vigliotti, 75 AD2d 859). However, no questioning occurred at that time. Subsequently, at the precinct, defendant was given Miranda warnings by Detective Smith. Defendant knowingly, voluntarily and intelligently waived his rights, as evidenced by the signed Miranda rights form. Since no interrogation occurred during the time between the rights administered by Heidrich and those by Smith, defendant could properly waive his rights, there being no evidence of any coercive actions on the part of the police to induce his statement (see, People v Gary, 31 NY2d 68). Thus to the extent it is understandable or at all usable at trial, there is no basis to suppress the statement.
Accordingly, defendant’s motion to suppress identification and statements is denied in all respects.